USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/8/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

HESHAM ZAGHLOUL ELDESOUKY, *et al.*,

Plaintiffs,

-v.-

HATEM ABDEL AZIZ, *et al.*,

Defendants.

---------------------------------------------------------------X

**OPINION AND ORDER**

11-CV-6986 (JLC)

**JAMES L. COTT, United States Magistrate Judge.**

By Opinion and Order dated December 19, 2014, the Court granted summary judgment against Hatem Abdel Aziz on Plaintiffs' breach of contract claim. The Court now considers the damages to which Plaintiffs are entitled by virtue of obtaining summary judgment against Aziz. For the reasons that follow, the Court directs that judgment be entered against Aziz in the amount of $1,237,301.36, plus prejudgment interest, as well as $8,310.13 in attorneys' fees.

## I. BACKGROUND

Familiarity with the Court's December 19, 2014 Opinion and Order ("Opinion and Order") related to Plaintiffs' motion for summary judgment and default judgment is presumed. *See Eldesouky v. Aziz*, No. 11-CV-6986 (JLC), 2014 WL 7271219, at *1-3 (S.D.N.Y. Dec. 19, 2014) (Dkt. No. 72). Accordingly, the Court will only briefly recite the facts here as taken from those that were undisputed and established at the summary judgment stage and from a declaration submitted by Hesham Zaghloul Eldesouky ("Eldesouky Decl.") (Dkt. No. 76-1) in connection with Plaintiffs' damages application now before the Court.

USDC SDNY
DATE SCANNED 4/8/15

## A. Factual Background

On January 13, 2011, plaintiffs Tasneem Company ("Tasneem") and Al-Yasmin Company ("Al-Yasmin"), through their principals Eldesouky and Abbas Elsayed Abbas ("Abbas"), respectively, entered into a contract with defendant General Trade Corporation, Inc. ("General Trade") to purchase 2,000 metric tons of flaxseed at $420 per metric ton. Eldesouky Decl., Ex. A (contract dated Jan. 13, 2011). Eldesouky agreed to pay 10% of the total cost, Abbas 75%, and Aziz 15%. *Id.* (Second Article). After confirming that the flaxseed met the contracted-for quality specifications, Plaintiffs paid Aziz $721,590 in installments over the next several months. Eldesouky Decl. ¶ 11.[1]

Sometime thereafter, Plaintiffs learned that Aziz had contracted, through Pyramid, with a Canadian company named Richardson International Limited ("Richardson") to purchase 4,000 metric tons of flaxseed at $660 per metric ton. *Id.* at ¶ 12, Ex. C (contract dated Apr. 26, 2011). They further learned that Aziz had paid Richardson using $443,750 of Plaintiffs' money. *Id.* at ¶ 14. Plaintiffs therefore contacted Richardson, and Richardson agreed to credit the money it had received from Aziz towards Plaintiffs' own purchase, but only if they agreed to acquire 4,000 metric tons of flaxseed at the same price Pyramid had agreed to pay. *Id.* at ¶ 15. Plaintiffs agreed to these terms, and Aziz was to transfer $278,360 to Richardson as the remainder of the money Plaintiffs had paid him. *Id.* at ¶¶ 16-18.[2] Ultimately, Aziz did

---

[1] Plaintiffs paid $35,500 of the $721,590 to Aziz's company, Pyramid Grain International, Inc. ("Pyramid"), rather than to Aziz. The Court previously granted a default judgment against Pyramid in this amount and pierced the corporate veil to hold Aziz liable for it. Opinion and Order at 34-39.

[2] The actual sum that Aziz retained is $277,840 ($721,590 minus $443,750).


not deliver this money either to Richardson or to Plaintiffs nor did Plaintiffs receive the flaxseed they contracted to purchase from General Trade. *Id.* at ¶ 18.

Plaintiffs began receiving shipments of flaxseed from Richardson in August 2011. Richardson's first shipment was 989.062 metric tons of flaxseed. *Id.* at ¶ 19. Richardson credited a pro rata portion of the money received from Aziz towards Plaintiffs' purchase. *Id.* Plaintiffs resold this flaxseed at a loss due to its poor quality. *Id.* at ¶ 20. Because Plaintiffs allegedly had a difficult time finding buyers for further shipments, Richardson then sold 750 metric tons of flaxseed on Plaintiffs' behalf, crediting a pro rata portion of Aziz's payment towards the flaxseed, which again resulted in a loss to Plaintiffs. *Id.* at ¶ 22. Richardson sent a third and final shipment of 242.193 metric tons of flaxseed to Plaintiffs in approximately September 2012; however, it was seized by Egyptian authorities due to the low quality of grain. *Id.* at ¶¶ 23, 25-26. In total, Plaintiffs received 1981.255 of the 4,000 metric tons contracted-for from Richardson. During this period, Richardson also charged Plaintiffs storage fees for the flaxseed. *Id.* at ¶ 24.

**B. Procedural History**

On November 26, 2013, Plaintiffs moved for summary judgment against Aziz and default judgment against General Trade and Pyramid. (Dkt. Nos. 44-50). Neither Aziz nor the corporate defendants submitted any responsive papers, and the Court granted summary judgment against Aziz with respect to Plaintiffs' breach of contract claim in an amount to be determined upon further submissions by the parties. (Dkt. No. 72).[3] The Court then held a conference to discuss conducting an

[3] The Court denied Plaintiffs' motion for summary judgment on their fraud claim against Aziz. However, at the January 22, 2015 conference with the Court, Plaintiffs

inquest on damages on January 22, 2015, but Aziz did not appear. (Dkt. No. 73). The Court now has before it Plaintiffs' submissions on damages and a separate application for attorneys' fees in connection with their motion for discovery-related sanctions. *See* Plaintiffs' Memorandum of Law in Support of Their Inquest on Damages ("Pl. Mem.") (Dkt. No. 76); Declaration of Mark H. Bierman ("Bierman Decl.") (Dkt. No. 79). Aziz has not submitted any opposition papers.

## II. DISCUSSION

### A. Choice of Law

Plaintiffs contend for the first time in their application for damages that the United Nations Convention on Contracts for the International Sale of Goods ("CISG") is applicable to the contract at issue in this action. Pl. Mem. at 5-6. The CISG is an international treaty governing contracts for the "sale of goods between parties whose places of business are in different States . . . when the States are Contracting States."

---

indicated that they were not likely to pursue this claim further in light of the likelihood that any damages related thereto would not exceed the damages to which they are already entitled by virtue of obtaining summary judgment on their breach of contract claim (and the Court agreed with this assessment). Transcript of January 22, 2015 Proceedings ("Transcript"), at 7-8; *see also e.g.*, *Manney v. Reichert*, No. 13-CV-4413 (SJF) (GRB), 2014 WL 4805046, at *16 (E.D.N.Y. Sept. 26, 2014) (A court evaluates whether a plaintiff is entitled to punitive damages for fraud related to a contract claim using the same test as for punitive damages in a contract claim. This requires, *inter alia*, that the fraudulent "conduct must be part of a pattern directed at the public." *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 316 (1995)). Despite the Court's directive to confirm this course of action, *see* Transcript at 13, Plaintiffs did not make any reference to their fraud claim in the submissions presently before the Court. Accordingly, the Court considers that claim to be abandoned. *See, e.g.*, *Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) ("Where abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended.").

Art. 1, § 1(a).[4] Here, both the United States and Egypt are "Contracting States."[5] The CISG has been described as "a self-executing agreement," meaning that, unless parties to a contract explicitly opt out of the CISG, it governs. *Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024, 1027 (2d Cir. 1995); *see also Hanwha Corp. v. Cedar Petrochemicals, Inc.*, 760 F. Supp. 2d 426, 430-31 (S.D.N.Y. 2011). Therefore, the CISG would seem to apply to the contract at issue in this dispute since Tasneem and Al-Yasmin are Egyptian companies while General Trade and Pyramid are American; however, by waiting until this late juncture to raise the applicability of the CISG, Plaintiffs have waived it. *See, e.g.*, *Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, No. 09-CV-8578 (JPO), 2014 WL 4746130, at *30 (S.D.N.Y. Sept. 24, 2014) (courts more likely to find "choice-of-law determination to have been waived [at] a late stage in litigation, such as at the point of making of summary judgment motions") (citation omitted).

In any event, because there is so little case law applying the CISG, courts often look to Article 2 of the Uniform Commercial Code ("UCC") for guidance, even though the UCC is not "*per se* applicable" to the CISG. *Delchi Carrier SpA*, 71 F.3d at 1028 (citation omitted); *Macromex SRL v. Globex Int'l, Inc.*, No. 08-CV-114 (SAS), 2008 WL 1752530, at *2 (S.D.N.Y. Apr. 16, 2008), *aff'd*, 330 F. App'x 241 (2d Cir. 2009). Therefore, as a practical matter, whether the UCC or the CISG governs is likely

---

[4] *Available at* http://www.uncitral.org/pdf/english/texts/sales/cisg/V1056997-CISG-e-book.pdf (Nov. 2010).

[5] United Nations Commission on International Trade Law, *Status, United Nations Convention on Contracts for the International Sale of Goods*, *available at* http://www.uncitral.org/uncitral/en/uncitral_texts/sale_goods/1980CISG_status.html (2015).

immaterial. Accordingly, the Court will evaluate Plaintiffs' request for damages by reference to Article 2 of the UCC, which New York has adopted. *See* N.Y. U.C.C. Law § 2-101 *et seq.*[6]

**B. Damage Calculations under the Uniform Commercial Code**

The UCC provides that its remedies "must be liberally administered" with the goal of placing the non-breaching party "in as good a position as if the other party had fully performed." N.Y. U.C.C. Law § 1-305(a); *see also Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 185 (2d Cir. 2007).

Section 2-711(1) of the UCC provides an aggrieved buyer with a number of options where, as here, a seller fails to deliver goods: the buyer may "(a) 'cover' and have damages under [§ 2-712] as to all the goods affected whether or not they have been

[6] Plaintiffs also argue for the first time that New Jersey law should apply, presumably as a source of interpretation of the UCC as gloss on the CISG. Pl. Mem. at 5. "A federal court sitting in diversity jurisdiction applies the choice of law rules of the forum state," *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012), and in New York, courts have "adopt[ed] a 'center of gravity' approach to choice-of-law questions in contract cases. This approach requires application of the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." *Bank of New York v. Yugoimport*, 745 F.3d 599, 609 (2d Cir. 2014) (collecting cases). The contract at issue here was between New Jersey and Egyptian citizens for provision of flaxseed from Canada, and funded by wire transfers to New York bank accounts, and thus, arguably, both New York and New Jersey have an equal interest in the matter. However, because Plaintiffs are arguing for the application of New Jersey law for the first time now, having brought the action in New York (and having previously cited New York law in their summary judgment papers), the Court will apply New York law. *See, e.g., Saint Paul Commodities, LLC v. Island Biofuel, LLC*, No. 12-CV-3108 (DRH) (AKT), 2013 WL 3874447, at *5 (E.D.N.Y. July 25, 2013) (where difficult to determine center of gravity, court applied law of forum state). As a practical matter, the distinction is inconsequential because both New York and New Jersey have adopted Article 2 of the UCC in its entirety. *See, e.g., World Wide Tours of Greater NY, Ltd. v. Parker Hannifin Customer Support, Inc.*, No. 07-CV-1007 (FB), 2008 WL 516676, at *3 n.2 (E.D.N.Y. Feb. 25, 2008) ("[T]here is no conflict between the laws of New York and New Jersey in regard to the contract claims because both states adhere to the Uniform Commercial Code.")

identified to the contract; or (b) recover damages for non-delivery as provided in [§ 2-713]." Both sections 2-712 and 2-713 also provide that a buyer may recover any incidental and consequential damages "less expenses saved in consequence of the seller's breach." N.Y. U.C.C. Law §§ 2-712(2), 2-713(1).

The UCC defines incidental damages to include, among other things, "any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach." *Id.* § 2-715(1). Consequential damages, on the other hand, are those "resulting from the seller's breach" and may include "any loss resulting from general or particular requirements and needs [of the buyer] of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." *Id.* § 2-715(2)(a); *see also Kenford Co. v. County of Erie*, 73 N.Y.2d 312, 321 (1989) (Consequential damages "are restricted to those damages which were reasonably foreseen or contemplated by the parties during their negotiations or at the time the contract was executed."). Where a contract is silent as to consequential damages, "the court must take a 'common sense' approach, and determine what the parties intended by considering 'the nature, purpose and particular circumstances of the contract known by the parties . . . as well as what liability the defendant fairly may be supposed to have assumed consciously.'" *Schonfeld v. Hillard*, 218 F.3d 164, 172 (2d Cir. 2000) (quoting *Kenford*, 73 N.Y.2d at 319).

**1. General Damages**

Here, upon learning of Aziz's breach, Plaintiffs attempted to "cover" by purchasing flaxseed from Richardson. Under the UCC, a "buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to

purchase goods in substitution for those due from the seller." N.Y. U.C.C. Law § 2-712(1). Although Richardson's flaxseed price was higher than General Trade's, and Richardson required Plaintiffs to purchase twice as much flaxseed, there is nothing to suggest that Plaintiffs' decision to purchase cover from Richardson was not in good faith or otherwise unreasonable. *See, e.g., Fertico Belgium S.A. v. Phosphate Chemicals Exp. Ass'n, Inc.*, 70 N.Y.2d 76, 82 (1987) (referring to "presumably higher cost of cover"); Official Comment to N.Y. U.C.C. Law § 2-712 (goods purchased as cover need not be "identical with those involved but commercially usable as reasonable substitutes under the circumstances of the particular case"); *cf. Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers, Inc.*, 887 F. Supp. 2d 459, 480-81 (E.D.N.Y. 2012) (defendant challenged reasonableness of chosen cover). Upon learning of Aziz's breach, Plaintiffs promptly contacted Richardson and contracted with it for flaxseed because if they had not, Richardson would have kept the money that Aziz had already transferred. Eldesouky Decl. ¶¶ 14-15. Therefore, Plaintiffs are entitled to "recover from the seller as damages the difference between the cost of cover and the contract price . . . less expenses saved in consequence of the seller's breach." N.Y. U.C.C. Law § 2-712(2).

The difference in price between the Richardson and the General Trade contracts is calculated as follows: Plaintiffs agreed to pay General Trade $420 per metric ton exclusive of shipping fees, which, because they agreed to pay only 85% of the total costs, is effectively $357 per metric ton. Eldesouky Decl., Ex. A (contract dated Jan. 13, 2011). Richardson required Plaintiffs to pay $660 per metric ton exclusive of shipping costs. *Id.*, Ex. F (contract dated June 15, 2011). Plaintiffs therefore paid $303 more per metric ton to purchase 2,000 metric tons of flaxseed from Richardson than they would

have paid Aziz/General Trade absent the breach, and are therefore entitled to **$606,000** as a result ($303 per metric ton multiplied by 2,000 metric tons).[7]

Additionally, after transferring $443,750 of Plaintiffs' money to Richardson, Aziz still retained $277,840 of the money Plaintiffs had paid under the General Trade contract ($721,590 minus $443,750).[8] Aziz has not returned this sum to Plaintiffs or provided an equivalent amount of flaxseed. Eldesouky Decl. ¶ 18. Therefore, Plaintiffs are entitled to receive **$277,840** in addition to their cover damages, for total general damages of **$883,840** ($606,000 plus $277,840).

**2. Incidental Damages**

Plaintiffs seek as incidental damages the storage fees they incurred in connection with the Richardson flaxseed purchase. Pl. Mem. at 12-13. The Court finds that storage fees are both commercially reasonable and related to the breach. *See Delchi Carrier SpA*, 71 F.3d at 1030 (storage fees reasonably foreseeable incidental damages under UCC). Richardson charged Plaintiffs $41,239.51 for storage from November 30, 2011 to April 30, 2012 ($0.12 per metric ton of flaxseed per day) as well as $221.85 in connection with the September 2012 flaxseed shipment. Eldesouky Decl.,

---

[7] The record before the Court reflects that Plaintiffs have, in fact, purchased 1981.255 metric tons of flaxseed from Richardson to date. Eldesouky Decl., ¶¶ 19, 22-23. This slight difference would result in approximately $5,679 less in general damages. However, the Court, like Plaintiffs, will presume that they intended to purchase and receive an equivalent amount of flaxseed from Richardson in their cover transaction as from Aziz and General Trade.

[8] The $721,590 figure includes the $35,500 Plaintiffs paid directly to Pyramid. The Court's calculation of general damages therefore incorporates the $35,500 default judgment against Pyramid Grain for conversion, for which the Court already pierced Pyramid's corporate veil to hold Aziz liable. Opinion and Order at 34-39.

Ex. M (Richardson invoice dated May 1, 2012), Ex. K (Richardson invoice dated July 25, 2012). Together, this equals **$41,461.36** in storage fees ($41,239.51 plus $221.85).

### 3. Consequential Damages

Plaintiffs seek consequential damages for: (1) their lost profits, (2) costs associated with the lower quality of flaxseed received from Richardson, and (3) the cost of purchasing an additional 2,000 metric tons of flaxseed from Richardson. The Court will address each of these categories of consequential damages in turn. For the reasons that follow, Plaintiffs are entitled to $312,000 in lost profits. However, Plaintiffs have not demonstrated that they are entitled to any damages related to additional flaxseed purchased from Richardson or that Aziz is responsible for the losses they suffered as a result of the poor quality of Richardson's flaxseed.

#### a. Lost Profits

First, Plaintiffs seek lost profits, which they calculate by reference to the Egyptian market price for flaxseed "[a]t the time that the flaxseed from Aziz was to be delivered." Eldesouky Decl. ¶ 37; *see also* Pl. Mem. at 15-17. Where, as here, a contract for the purchase of goods contemplates that the buyer will resell those goods, lost profits are found to constitute consequential damages that the seller should have reasonably foreseen at the time of contracting. *See, e.g., RIJ Pharm. Corp. v. Ivax Pharm., Inc.*, 322 F. Supp. 2d 406, 415 (S.D.N.Y. 2004); *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 22 N.Y.3d 799, 806-08 (2014); *Val Tech Holdings, Inc. v. Wilson Manifolds, Inc.*, 119 A.D.3d 1327, 1329 (4th Dep't 2014); *Fruition, Inc. v. Rhoda Lee, Inc.*, 1 A.D.3d 124, 125 (1st Dep't 2003); Comment to N.Y. U.C.C. Law § 2-715 ("In the case of sale of wares to one in the business of reselling them, resale is one of the requirements of which the seller has reason to know."). Plaintiffs contend that the

market price for flaxseed in Egypt was $816 per metric ton at the time they had intended to resell it. Eldesouky Decl. ¶ 37. Because the difference in price between the Richardson and General Trade contracts was already accounted for as part of cover damages, the Court will calculate lost profits using the $660 per metric ton price from Richardson, as Plaintiffs suggest. Pl. Mem. at 17 n.3. Accordingly, Plaintiffs' lost profits on 2,000 metric tons of flaxseed are $156 per metric ton ($816 minus $660), or **$312,000** in total ($156 per metric ton multiplied by 2,000 metric tons).

**b. Poor Quality of Flaxseed from Richardson**

Second, Plaintiffs seek damages to compensate them for the lower quality (and consequently, lower value) of the flaxseed they received from Richardson. Pl. Mem. at 17-21. The Court finds that such damages are not appropriate based on the record presented here. The Court agrees with Plaintiffs that, in a resale contract such as the one at issue here, it is reasonably foreseeable that if the buyer does not receive goods meeting the quality specifications in the contract, losses would result. *See, e.g.*, *D. Klein & Son, Inc. v. Good Decision, Inc.*, 147 F. App'x 195, 199 (2d Cir. 2005) (damages upheld where reseller received goods of inferior quality). Here, Plaintiffs' contract with General Trade specified the quality of flaxseed to be sold and included a provision that, if upon testing, the flaxseed did not meet these requirements, Plaintiffs would be entitled to receive their contractual down payment back. Eldesouky Decl., Ex. A (contract dated Jan. 13, 2011) (Sixth Article). Therefore Aziz can be deemed to have understood at the time of contracting that flaxseed quality was one of Plaintiffs' "particular requirements and needs." N.Y. U.C.C. Law § 2-715(2)(a).

Nevertheless, Aziz's breach was not the proximate cause of Plaintiffs' losses in this regard; rather, Richardson's failure to deliver flaxseed of a higher quality

represents a break in the causal chain. *See, e.g.*, *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 526 (2d Cir. 2004) ("[D]amages may be . . . the result of *other intervening causes*, and then they cannot be allowed.") (citation omitted); *Kenford Co. v. Erie Cnty.*, 67 N.Y.2d 257, 261 (1986) (same). Therefore, regardless of whether such a category of damages may have been foreseeable, Aziz is not liable for losses due to the poor quality of flaxseed Richardson provided to Plaintiffs.[9]

**c. Additional Flaxseed Purchased from Richardson**

Finally, Plaintiffs seek recompense for having to purchase an additional 2,000 metric tons of flaxseed from Richardson. Pl. Mem. at 21-22. While it may have been foreseeable that, upon a breach, Plaintiffs' source of cover flaxseed might require them to purchase extra grain, Plaintiffs have not shown that they did, in fact, purchase this additional flaxseed. The record reflects that Plaintiffs agreed to purchase 4,000 metric tons of flaxseed from Richardson, *see* Eldesouky Decl., Ex. F, but that they have paid for only 1981.255 metric tons to date, the last shipment of which was more than two years ago. *See* Eldesouky Decl. ¶¶ 19, 22-23. At the Court's January 22, 2015 conference, Plaintiffs' counsel represented that, after receiving flaxseed from Richardson of such poor quality, plaintiffs "basically said they weren't going to take anymore shipments," and instead initiated arbitration. Transcript at 3; *see also supra* n.9. Despite

---

[9] Relatedly, Plaintiffs have not provided the Court with any information regarding Plaintiffs' efforts to recover damages from Richardson in connection with the flaxseed they received. At the January 22, 2015 conference, Plaintiffs' counsel represented that Plaintiffs were seeking precisely such recovery through "FOSFA, . . . a trade organization that arbitrates [grain-related] disputes," and that he was in the process of acquiring a copy of the related FOSFA decision. Transcript at 4, 6. Plaintiffs did not provide a copy of the arbitration decision with their papers, but in any event should not be allowed to recover from both Richardson and Aziz for the same losses related to the quality of Richardson's flaxseed.

representations to the contrary, Plaintiffs have not provided the Court with any information on the result of this arbitration or argued its impact on any damage calculation. The record thus does not support any damages in this category.

**4. Prejudgment Interest**

Plaintiffs also seek prejudgment interest, which they characterize as "incidental damages." Pl. Mem. at 13-14. "The law of the state which was applicable in determining liability in the first instance, is applicable in determining whether an award of prejudgment interest is appropriate." *Vitol S.A., Inc. v. Koch Petroleum Grp., LP*, No. 01-CV-2184 (GBD), 2005 WL 2105592, at *12 (S.D.N.Y. Aug. 31, 2005) (citing *In re Gaston & Snow*, 243 F.3d 599, 609 (2d Cir. 2001)); *accord Schipani v. McLeod*, 541 F.3d 158, 164 (2d Cir. 2008) ("In a diversity case, state law governs the award of prejudgment interest."). Here, the Court has applied New York law, and in New York, prejudgment interest "*shall* be recovered upon a sum awarded because of a breach of performance of a contract," at a rate of nine percent per year. N.Y. C.P.L.R. § 5001(a) (emphasis added), § 5004; *see also In re Johns-Manville Corp.*, 759 F.3d 206, 219-20 (2d Cir. 2014); *New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*, 352 F.3d 599, 606 (2d Cir. 2003) ("[U]nder New York law, 'prejudgment interest is normally recoverable as a matter of right in an action at law for breach of contract.'") (citation omitted).

New York law further provides that interest "shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred." N.Y. C.P.L.R. § 5001(b). "[I]n breach of contract actions, 'the earliest ascertainable date' referenced in C.P.L.R. § 5001(b) for the purposes of computing prejudgment interest 'arises when the alleged

breach occurred.'" *Citibank, N.A. v. Barclays Bank, PLC*, 28 F. Supp. 3d 174, 185 (S.D.N.Y. 2013) (quoting *McNally Wellman Co. v. New York*, 63 F.3d 1188, 1200 (2d Cir. 1995)). Here, the Court finds that the date on which Aziz entered into a contract with Richardson (April 26, 2011) is the date of the breach, and correspondingly, the date upon which interest begins to accrue with respect to Plaintiffs' general damages and lost profits. *See* Eldesouky Decl., Ex C. Plaintiffs' incidental damages, however, accrued at a later date; specifically the dates on which Richardson charged them for flaxseed storage (May 1 and July 25, 2012), and interest on these amounts shall be calculated accordingly. *See* Eldesouky Decl., Exs. M and K.

**C. Attorneys' Fees**

Plaintiffs also seek attorneys' fees in connection with their motion for discovery sanctions. Pl. Mem. at 22; Bierman Decl. When the Court granted in part Plaintiffs' motion for sanctions, it denied without prejudice Plaintiffs' request for attorneys' fees. (Dkt. No. 40). They renewed their request for fees in their motion for summary judgment, and the Court reserved decision on the issue. (Dkt. No. 72, at 41).

**1. Legal Standard**

In order to determine the appropriate fee award, courts typically start by determining the so-called lodestar amount, which is "the product of a reasonable hourly rate and the reasonable number of hours required by the case." *Millea v. Metro-North R.R.*, 658 F.3d 154, 166 (2d Cir. 2011); *see also Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 553 (2010). "The reasonable hourly rate is the rate a paying client would be willing to pay," bearing in mind that "a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d

182, 190 (2d Cir. 2008). The Second Circuit has held that, in determining the reasonable hourly rate, district courts should also assess case-specific considerations, including the factors articulated by the Fifth Circuit in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 92-93 (1989). *See Arbor Hill*, 522 F.3d at 188-90. In determining the reasonable number of hours required by the case, the court must consider "whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992).

A plaintiff must "document the application [for fees and costs] with contemporaneous time records . . . specify[ing], for each attorney, the date, the hours expended, and the nature of the work done." *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983); *see also Scott v. City of N.Y.*, 626 F.3d 130, 132 (2d Cir. 2010). "[T]he burden is on the fee applicant to produce satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Angamarca v. Pita Grill 7 Inc.*, No. 11-CV-7777 (JGK) (JLC), 2012 WL 3578781, at *11 (S.D.N.Y. Aug. 2, 2012) (quoting *Blum v. Stenson*, 456 U.S. 886, 896 n.11 (1984)) (internal quotation marks omitted), *adopted by*, Order dated Dec. 13, 2012 (Dkt. No. 39). A court may also rely on its own knowledge of local, comparable rates. *Adorno v. Port Authority of N.Y. & N.J.*, 685 F. Supp. 2d 507, 511 (S.D.N.Y. 2010) (citation omitted); *see also Anthony v. Franklin First Financial, Ltd.*, 844 F. Supp. 2d 504, 507 (S.D.N.Y. 2012).

Counsel for the prevailing party must submit evidence in support of the proposed figures and make a good faith effort to exclude excessive, redundant, or unnecessary hours from the fee request. *Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983); *accord Quaratino v. Tiffany & Co.*, 166 F.3d 422, 426 n.6 (2d Cir. 1999).

Ultimately, the district court's discretion to set a fee award is broad. *Hensley*, 461 U.S. at 437; *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 64 (2d Cir. 2014) ("We afford a district court considerable discretion in determining what constitutes reasonable attorney's fees in a given case, mindful of the court's 'superior understanding of the litigation and . . . what essentially are factual matters.'") (quoting *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 151 (2d Cir. 2008)).

**2. Plaintiffs' Attorneys' Fees**

Plaintiffs' motion for sanctions was litigated by partner Mark Bierman and associate Lauren Reiff, then of Bierman & Palitz LLP. Bierman, a named partner at his law firm, has "more than thirty-two years of experience as a litigator" in state and federal court. Bierman Decl. ¶ 4. Bierman's rate is $475 per hour. *Id.* at ¶ 11. Reiff had almost three years of experience at the time, and her hourly rate was $285. *Id.* at ¶ 5. Although Bierman has not provided the Court with any evidence that the requested rates are reasonable and in line with the market in this District, the Court's own review confirms that courts in this District have recently awarded attorneys' fees charged at rates comparable to those requested here for attorneys with similar experience. *See, e.g.*, *Bravia Capital Partners, Inc. v. Fike*, 296 F.R.D. 136, 145 (S.D.N.Y. 2013) (approving $400 per hour for partner with 20 years of experience and

$225 per hour for associate with four years of experience) (collecting cases); *Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*, No. 10-CV-05256 (KMW) (DF), 2012 WL 5816878, at *6 (S.D.N.Y. Nov. 14, 2012) (awarding $300 per hour for associate with two years of experience).

Regarding the number of hours worked, Bierman has attached billing records showing that he and Reiff worked 32.1 hours, and contends that 75% of this time involved preparing the discovery sanctions motion. Bierman Decl. ¶ 12, Ex. A.[10] The billing entries reflect that Bierman billed 3.5 hours on this motion ($1,662.50) and Reiff billed 28.6 hours ($8,151.00). *Id.* The time entries themselves are rather sparse, with the majority of entries simply listed as "preparation of motion papers." *Id.* Nevertheless, the Court is familiar with the facts and complexity of this case and the work that was required to brief the motion for sanctions, which Plaintiffs won, and finds the number of hours expended to be reasonable. Together, Bierman and Reiff billed $9,813.50, but because only 75% of their time related to the sanctions motion, *see* Bierman Decl. ¶ 12, the total amount is $7,360.13. Adding this sum to the two hours that Bierman spent preparing the fee application ($950), *see id.* at ¶ 13, the Court awards Plaintiffs **$8,310.13** in attorneys' fees.

---

[10] It appears that Plaintiffs' request for attorneys' fees includes a typographical error. The billing entries provided show that Bierman and Reiff billed 32.3 hours on this matter, although one of the entries is marked "omit" because it did not relate to the sanctions motion. *See* Bierman Decl. ¶ 7. The entry so designated is for 0.2 hours, but Plaintiffs subtracted 1.1 hours from their proposed total instead. *Id* at ¶ 10.

## III. CONCLUSION

For all of the foregoing reasons, the Court directs that judgment be entered against Aziz in the amount of $1,237,301.36, with prejudgment interest running at the statutory rate of nine percent from the interest accrual dates listed below until the date judgment is entered.

| Description | Amount | Interest Accrual Date |
|---|---|---|
| General Damages | $883,840.00 | April 26, 2011 |
| Incidental Damages (storage fees) | $41,461.36 | May 1, 2012 ($41,239.51)<br>July 25, 2012 ($221.85) |
| Consequential Damages (lost profits) | $312,000.00 | April 26, 2011 |
| Consequential Damages (quality of flaxseed) | $0.00 | |
| Consequential Damages (additional flaxseed) | $0.00 | |
| **TOTAL** | $1,237,301.36 | |

The Court also awards Plaintiffs $8,310.13 in attorneys' fees.

Given that the Court has previously granted a default judgment against Pyramid in the amount of $35,500 and dismissed the claims against General Trade, the case may now be closed after judgment is entered.

**SO ORDERED.**

Dated: New York, New York
April 8, 2015

JAMES L. COTT
United States Magistrate Judge

**A copy of this Opinion and Order has been mailed to the following:**

Hatem Abdel Aziz
77 Twin Oaks Oval
Springfield, New Jersey 07081